**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| ANTHONY RIZZO, Plaintiff, | ) | |
| v. | ) | Case No. |
| ORTHOMIDWEST, PLLC Defendant. | ) | |

## COMPLAINT

1. This is a breach of contract and employment discrimination and retaliation action under the Family & Medical Leave Act ("FMLA), 29 U.S.C. § 2601, *et seq*., the Illinois Human Rights Act ("IHRA"), 775 ILCS 5/1-101, *et seq*., and Illinois' Personnel Record Review Act, 820 ILCS 40/0.1, *et seq.*

2. Plaintiff, Dr. Anthony Rizzo, thought he had found his dream job when Defendant, OrthoMidwest, PLLC, hired him as a physician in January 2024, but after complaining of workplace harassment, disclosing a disability, taking job-protected absences for the disability and, separately, to care for his immediate family members, Defendant discriminated and retaliated against him in violation of state and federal law by, *inter alia*, terminating his employment. Post-separation, Defendant has continued to retaliate against Plaintiff, seeking to impose non-compete terms that are inapplicable to him and withholding information he requested to mitigate his economic damages in a flagrant attempt to interfere with his efforts to secure gainful employment.

### PARTIES

3. Defendant OrthoMidwest PLLC is medical care provider that focuses on providing orthopedic health services. Defendant is organized under Illinois law and maintains offices in

"Algonquin, Bartlett, Buffalo Grove, Chicago, Elk Grove Village, Elgin, Joilet [sic], McHenry, Munster (Indiana), Naperville, Oak Park, Oak Brook, Rockford, Schaumburg and Westchester."[1]

4. Plaintiff is an Illinois resident and a board certified physician who specializes in family medicine and primary care sports medicine.

## JURISDICTION

5. The Court has jurisdiction of Plaintiff's FMLA claims under 28 U.S.C. § 1331.

6. The Court has supplemental jurisdiction of the state law breach of contract claim, and claims under the IHRA and IPRRA under 28 U.S.C. § 1367(a) because such claims are sufficiently related to the claims under federal law that they form part of the same case or controversy.

## VENUE

7. Venue is appropriate in this District under 28 U.S.C. 1391(b) because Defendant resides in this District.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

8. On March 4, 2026, Plaintiff dual-filed a Charge of Discrimination with the Equal Employment Opportunity Commission and the Illinois Department of Human Rights.

9. On March 13, 2026, the Illinois Department of Human Rights issued Plaintiff a Right to Sue/Notice of Opt-Out for the claims under Illinois state law that are subject to an administrative exhaustion requirement.[2]

---

[1] https://orthomidwest.com/?page_id=835 (last visited March 10, 2026

[2] Plaintiff will amend the Complaint to allege a disability discrimination claim under the Americans with Disability Act, 42 U.S.C. § 12101 *et seq.*, when the EEOC issues its Notice of Right to Sue to Plaintiff.

## ALLEGATIONS

10. Defendant hired Plaintiff as a physician in January 2024, in a part-time capacity, to serve patients primarily from its "Injury Express" clinic located in Elgin, Illinois.

11. Plaintiff entered an employment agreement with Defendant in July 2024 that provided for, *inter alia*, Plaintiff to work in a full-time capacity and serve patients at the company's Injury Express clinics located in Elgin and Algonquin, Illinois. From time to time during the relevant period, Plaintiff served patients from Defendant's Injury Express clinic located in Rockford, Illinois. Plaintiff practiced through Defendant's OrthoIllinois division.

12. Beginning in February 2025 and continuing through October 2025, Plaintiff complained to Defendant of workplace harassment he experienced from a physician, Dr. Pradeep Raju, who was senior to him and served, during a portion of the relevant period, as Medical Director for Defendant's Injury Express Clinic in Elgin, Illinois.

13. Specifically, Dr. Raju berated Plaintiff for the latter's seeking to discuss with Raju, for example, patient care and staff training at the Elgin clinic. Dr. Raju additionally demoralized Plaintiff by telling Plaintiff he should never have been hired by Defendant.

14. In May 2025, Plaintiff's wife underwent a surgery, and Plaintiff took job-protected absences to care for his spouse and three young children.

15. Shortly after Plaintiff returned from the job-protected absences, Defendant materially reduced his compensation by assigning additional providers to his shifts. The group-based medical staffing arrangement that Defendant retaliatory imposed on Plaintiff caused significant damage to his income because Defendant compensated Plaintiff based on individual activity.

16. Specifically, when Defendant assigned another medical care provider or providers to Plaintiff's shifts, it reduced his volume of patient encounters and relative value units (a metric

used by Medicare and insurers to compute reimbursement for medical services), which were material factors in determining his compensation. Neither the patient volume during Plaintiff's shifts when Defendant assigned multiple providers nor Press Ganey scores (patient satisfaction/experience metrics) warranted multiple providers.

17. Around the time Plaintiff took the job protected absences, Dr. Raju disclosed to Defendant's employees the nature of, and made lewd comments concerning, Plaintiff's wife's surgery. Raju's comments were particularly egregious given Defendant is a health care provider, and its express policies emphasize the importance of maintaining as strictly confidential individuals' medical information.

18. In June 2025, Plaintiff complained to Defendant about Dr. Raju's inappropriate comments concerning his wife, continued harassment, and Defendant's human resources department failed to even interview him in connection with any ostensible investigation. Defendant additionally failed to implement sufficient corrective action to ensure Dr. Raju's misconduct did not continue.

19. Stemming from the loss of compensation and Dr. Raju's mistreatment, Plaintiff experienced considerable anxiety and resulting chest pains that lasted six weeks beginning in/around July 2025. Plaintiff was acutely concerned with the deterioration in his physical condition given he has a genetic/family legacy of cardiovascular issues.

20. As early as October 2025, Defendant became aware of Dr. Rizzo's disability—generalized anxiety disorder.

21. After Defendant materially reduced Plaintiff's compensation in connection with his return from job-protected absences, Plaintiff's anxiety disorder exacerbated further and, symptomatically, caused him severe gastrointestinal distress.

### *Defendant Continues to Retaliate Against Plaintiff Because of Job-Protected Absences*

22. In October and November 2025, Plaintiff took job-protected absences under the Family & Medical Leave Act for his anxiety disorder and related gastrointestinal issues.

23. Defendant's policies required this sensitive, medical and leave-related information to be treated as strictly confidential.

24. However, around the time Plaintiff took FMLA leave, Defendant disclosed to other employees and at least one patient that Plaintiff was on leave for mental health reasons. When Plaintiff asked Defendant how a patient learned that one, he was on leave for medical reasons, and two, how the patient knew that the leave was related to mental health, Defendant responded that the patient must have made it up (despite the patient being accurate).

25. The next month, November 2025, Defendant's Chief Executive Officer, Anthony Brown, held an in-person meeting with Plaintiff. During the meeting, Brown challenged Plaintiff's attendance and his commitment to the organization given his FMLA-related absences in October and November.

26. Plaintiff reminded Brown during the meeting that the absences were under the FMLA and because of his health condition. Brown stated during the meeting that he did not want any more absences and that it appeared their employment relationship was concluding. Brown additionally discouraged Plaintiff from reporting concerns of workplace harassment, characterizing Plaintiff's prior complaints concerning Dr. Raju as "drama."

27. Around the time Plaintiff exercised his rights under the FMLA, Defendant also began monitoring his arrival times to shifts. Despite having arrived approximately ten to twenty minutes after the clinic opened since he began his employment with Defendant—simply so he

could take his children to school—Defendant, for the first time, challenged his punctuality and began keeping related records.

28. The next month, on December 26, 2025, Plaintiff's two-year old daughter fell downstairs in his residence during which she suffered multiple impacts to her head and sustained a related injury. Plaintiff left his shift early to provide care to his daughter and to support his wife.

29. The next month, on January 23, 2026, Defendant terminated Plaintiff's employment. During the related meeting, Brown informed Plaintiff he was being terminated without cause for attendance. Plaintiff reminded Brown during the meeting that the absences were protected under applicable law.

***Defendant's Records Reinforce It Engaged in Unlawful Conduct***

30. Paragraph 7 of Plaintiff's employment agreement with Defendant is titled "Compensation, PTO, and Other Benefits." Exhibit A, Associate Physician Professional Services Agreement, ¶ 7, at 13.

31. Paragraph 7 of the Agreement stated Plaintiff was entitled to "benefits" in accordance with Schedule 7 in the Agreement. *Id.*

32. Schedule 7.c.5., in turn, is titled "[b]enefits" and provides that Plaintiff "is entitled to personal leave for *any reason*, including … sick leave" subject to approval by Defendant and "taking into account coverage needs …." *Id.* at 28 (emphasis added).

33. Defendant additionally maintained an attendance and punctuality policy that it claims Plaintiff was subject to that required, sequentially: formal coaching, discussion of a performance development plan, and to "activate" a "performance development plan" before termination of employment for attendance/punctuality reasons. Defendant did not comply with its

policy and never disclosed to Plaintiff that it was treating *any* of his absences or late arrivals as unexcused under the policy.

34. Documents disclosed by Defendant pursuant to Plaintiff's request under the IPPRA show that Defendant treated as unexcused Plaintiff's absences on October 3, October 7, and October 30. Each absence was protected under and subject to the FMLA.

35. Documents disclosed by Defendant pursuant to Plaintiff's request under the IPPRA show that Defendant treated as unexcused Plaintiff's early departure from shifts on October 1. The early departure was protected under and subject to the FMLA. Documents disclosed by Defendant additionally reference Plaintiff's anxiety-related symptoms, stating Plaintiff departed the shift early on October 1 because he was "emotionally distraught from events of the day."

36. Documents disclosed by Defendant pursuant to Plaintiff's request under the IPRRA show that Defendant treated as unexcused Plaintiff's early departure from his shift on October 24. Defendant did not inform Plaintiff that the absence was not approved or inform Plaintiff that his attendance was required because of coverage issues at the clinic.

37. Defendant counted as unexcused Plaintiff's absence on October 31, 2025, but had permitted Plaintiff to take the day off.

38. Documents disclosed by Defendant pursuant to Plaintiff's request under the IPRRA show that Defendant treated as unexcused Plaintiff's request to be excused from a shift on November 7, 2025. Defendant did not inform Plaintiff that the absence was not approved or inform Plaintiff that his attendance was required because of coverage issues at the clinic.

39. Documents disclosed by Defendant pursuant to Plaintiff's request under the IPRRA show Defendant treated as unexcused Plaintiff's early departure from his shift to provide medical

care to his daughter on December 26, 2025, and state that Plaintiff left early because "it was slow" and "he wished to be home."

40. Documents disclosed by Defendant pursuant to Plaintiff's request under the IPRRA show that Defendant treated as unexcused Plaintiff's request to be excused from a shift on January 8, 2026, because he and his family had the flu. Plaintiff, as a physician, additionally wanted to ensure he provided medical care and support to his sick family members.

41. Plaintiff's termination without cause is subject to a 120-day notice provision in Plaintiff's employment agreement with Defendant. Plaintiff, therefore, remains a current employee of Defendant until May 23, 2026.

42. Defendant prohibited Plaintiff from practicing at Defendant's clinics during the 120-day notice period and therefore restricted his ability to earn income for his family.

***Defendant Continues to Retaliate Against Plaintiff after Informing Him of the Termination***

43. After communicating the termination decision to Plaintiff, Defendant sought to enforce non-compete terms in Plaintiff's employment agreement that were inapplicable to him as a matter of law. The operative provisions in the agreement state:

> Physician agrees that during the time of his employment and for a period of two (2) years after termination if Physician *is terminated by Employer for cause or voluntarily terminates his or her employment*:
>
> Physician shall not directly or indirectly solicit, recruit, induce, or coerce another person in the employ of the OrthoIllinois Division and the employ of the Employer or any affiliated entity (whether employed now or employed at any time during the period of this covenant) to terminate such employment;
>
> Physician shall not, directly or indirectly, whether as a sole practitioner, partner, stockholder, Physician, or otherwise engage in the practice of medicine within (i) twenty-five (25) miles of Winnebago County or Boone County, Illinois, (ii) a ten (10) mile radius of any of the facilities of the OrthoIllinois Division or any of OrthoIllinois Division's affiliated entities (including clinics, other facilities and physical therapy locations, and affiliated surgery centers), and (iii) a two (2) mile radius of any of the facilities of Employer's Midwest Orthopaedics at Rush Division or any of Midwest

> Orthopaedics at Rush Division's affiliated entities (including clinics, other facilities and physical therapy locations, and affiliated surgery centers); and ….

*See* Exhibit A, Associate Physician Professional Services Agreement, ¶ 11, at 14-15.

44. Irrespective of the non-compete terms being unenforceable on multiple grounds, the agreement's express terms only apply where a physician is terminated "for cause or voluntarily terminates his or her employment." *Id.* Plaintiff was terminated without cause.

45. Nevertheless, Defendant asserted the non-compete terms applied to Plaintiff and, before Plaintiff retained counsel, attempted to convince Plaintiff to waive such terms in exchange for Plaintiff signing a severance agreement with a full release of legal claims.

46. In early February 2026, Plaintiff informed Defendant that he was contemplating prosecuting this employment discrimination and retaliation action and sought his personnel records under the IPRRA.

47. Plaintiff additionally sought information from Defendant to process a commercial loan application, the funds for which are necessary for Plaintiff to begin a private physician practice and mitigate his economic damages. The information related to Plaintiff's compensation and revenue he generated while practicing for Defendant and which Defendant had previously shared with Plaintiff on a monthly basis.

48. Despite remaining a current employee of Defendant, it refused to disclose certain information Plaintiff requested because Plaintiff informed Defendant that he would be exercising his rights under the FMLA, ADA, and IHRA and therefore attempted to obstruct his efforts to secure gainful employment and mitigate his economic damages.

**COUNT I**
**RETALIATION UNDER THE FAMILY & MEDICAL LEAVE ACT**

49. Plaintiff incorporates by reference paragraphs 1-48 herein.

50. Defendant is an employer under the FMLA.

51. Plaintiff is an employee under the FMLA.

52. The FMLA prohibits an employer from retaliating against an employee for exercising their rights under the statute. *See* 29 U.S.C. §§ 2615(a)–(b).

53. Plaintiff engaged in protected activity under the FMLA when he took leave under the statute in October 2025.

54. Plaintiff suffered an adverse employment action when Defendant terminated his employment because of FMLA/attendance reasons.

55. As a consequence of Defendants' willful misconduct, Plaintiff suffered and continues to suffer damages in an amount to be determined at trial, including but not limited to, loss of income, loss of employment benefits, other financial losses, and loss of professional opportunities.

**COUNT II**
**INTERFERENCE UNDER THE FAMILY & MEDICAL LEAVE ACT**

56. Plaintiff incorporates by reference paragraphs 1-48 herein.

57. Defendant is an employer under the FMLA.

58. Plaintiff was entitled to leave under the FMLA during the relevant period.

59. The FMLA prohibits employers from interfering with employee's rights under the statute, *see* 29 U.S.C. §§ 2615(a)–(b), which includes "discouraging an employee from using such leave." *Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 818 (7th Cir. 2015).

60. Defendant interfered with Plaintiff's FMLA rights by discouraging him from using such leave during a meeting on or about November 21, 2025, during which Defendant's CEO questioned his commitment to the organization because of recent FMLA-related absences, stated the employment relationship appeared to be concluding, and asked Plaintiff whether he anticipated future absences.

61. Defendant's conduct affected Plaintiff's decision to take future leave under the FMLA.

62. As a consequence of Defendants' willful misconduct, Plaintiff suffered and continues to suffer damages in an amount to be determined at trial, including but not limited to, loss of income, loss of employment benefits, other financial losses, and loss of professional opportunities.

**COUNT III**
**DISABILITY DISCRIMINATION UNDER ILLINOIS' HUMAN RIGHTS ACT**

63. Plaintiff incorporates by reference paragraphs 1-48 herein.

64. Defendant is an employer under the IHRA.

65. Plaintiff is an employee under the IHRA.

66. The IHRA prohibits employers from discriminating against an employee based on, *inter alia*, a disability.

67. Plaintiff suffers from a disability – generalized anxiety disorder.

68. Plaintiff could perform the essential functions of his job with or without a reasonable accommodation.

69. Defendant terminated his employment because of his disability.

70. As a consequence of Defendants' willful misconduct, Plaintiff suffered and continues to suffer damages in an amount to be determined at trial, including but not limited to,

loss of income, loss of employment benefits, other financial losses, loss of professional opportunities, loss of personal and professional reputation, and emotional distress.

**COUNT IV**
**DISCRIMINATION BASED ON FAMILY RESPONSIBILITIES**
**UNDER ILLINOIS' HUMAN RIGHTS ACT**

71. Plaintiff incorporates by reference paragraphs 1-48 herein.

72. Defendant is an employer under the IHRA.

73. Plaintiff is an employee under the IHRA.

74. The IHRA prohibits an employer from discriminating against an employee based on, *inter alia*, "family responsibilities." 775 ILCS 5/2-102(A).

75. "Family responsibilities" is defined under the statute to include "activities to ensure that a covered family member's basic medical, hygiene, nutritional, or safety needs are met, or to provide transportation to medical appointments, for a covered family member who is unable to meet those needs himself or herself." 775 ILCS 5/2-101(M) (incorporating statutory definition of "personal care" under Illinois' Employee Sick Leave Act, 820 ILCS 191/5, as definition of "family responsibilities").

76. Plaintiff took job-protected absences in/around May 2025 to provide medical care to his spouse after his spouse underwent a surgical operation and to ensure his three young children's nutritional and safety needs were met while she recovered.

77. Shortly thereafter, Defendant discriminated against Plaintiff by materially reducing his compensation.

78. On December 26, 2025, Plaintiff took a job-protected absence to provide medical care to his two-year old daughter after she suffered head trauma from a fall downstairs in Plaintiff's residence.

79. On January 8, 2026, Plaintiff took a job-protected absence because he and his family members had the flu. Plaintiff, as a physician, additionally wanted to ensure he provided medical care and support to his sick family members.

80. Defendant treated these absences as unexcused, and shortly thereafter, terminated Plaintiff's employment for taking this job-protected absences.

81. As a consequence of Defendants' willful misconduct, Plaintiff suffered and continues to suffer damages in an amount to be determined at trial, including but not limited to, loss of income, loss of employment benefits, other financial losses, loss of professional opportunities, loss of personal and professional reputation, and emotional distress.

**COUNT V**
**RETALIATION BASED ON FAMILY RESPONSIBILITIES**
**UNDER ILLINOIS' HUMAN RIGHTS ACT**

82. Plaintiff incorporates by reference paragraphs 1-48 herein.

83. Defendant is an employer under the IHRA.

84. Plaintiff is an employee under the IHRA.

85. The IHRA prohibits an employer from retaliating against an employee based on, *inter alia*, "family responsibilities."

86. "Family responsibilities" is defined under the statute to include "activities to ensure that a covered family member's basic medical, hygiene, nutritional, or safety needs are met, or to provide transportation to medical appointments, for a covered family member who is unable to meet those needs himself or herself." *See* 775 ILCS 5/2-101(M) (incorporating statutory definition of "personal care" under Illinois' Employee Sick Leave Act, 820 ILCS 191/5, as definition of "family responsibilities").

87. Plaintiff engaged in protected activity by disclosing and requesting Defendant in/around May 2025 to approve absences to provide medical care to his spouse after his spouse underwent a surgical operation and to ensure his three young children's nutritional and safety needs were met while she recovered.

88. Shortly thereafter, Defendant retaliated against Plaintiff by materially reducing his compensation.

89. On December 26, 2025, engaged in protected activity by disclosing and requesting Defendant to approve an absence to provide medical care to his two-year old daughter after she suffered head trauma from a fall downstairs in Plaintiff's residence.

90. On January 8, 2026, Plaintiff engaged in protected activity by disclosing and requesting Defendant to approve an absence because he and his family members had the flu and Plaintiff was consistently vomiting.

91. Defendant retaliated against Defendant by treating these absences as unexcused, and shortly thereafter, terminated Plaintiff's employment.

92. As a consequence of Defendants' willful misconduct, Plaintiff suffered and continues to suffer damages in an amount to be determined at trial, including but not limited to, loss of income, loss of employment benefits, other financial losses, loss of professional opportunities, loss of personal and professional reputation, and emotional distress.

## COUNT VI
## BREACH OF CONTRACT

93. Plaintiff incorporates by reference paragraphs 1-48 herein.

94. Plaintiff and Defendant entered an employment agreement on or about July 1, 2024. Exhibit A, Associate Physician Professional Services Agreement.

95. Paragraph 7 of the Agreement is titled "Compensation, PTO, and Other Benefits." Associate Physician Professional Services Agreement, ¶ 7, at 13.

96. Paragraph 7 of the Agreement stated Plaintiff was entitled to "benefits" in accordance with Schedule 7 in the Agreement. *Id.*

97. Schedule 7.c.5., in turn, is titled "[b]enefits" and provides that Plaintiff "is entitled to personal leave for *any reason*, including … sick leave." (emphasis added). *Id.* at 28.

98. Defendant materially breached the employment agreement by treating absences in October, November, and December 2025 and January 2026 as unexcused and relying on such absences as basis for terminating Plaintiff's employment.

99. Defendant never informed Plaintiff that such absences were not approved or his attendance was necessary at the clinic on the relevant dates.

100. As a consequence of Defendants' willful misconduct, Plaintiff suffered and continues to suffer economic and consequential damages in an amount to be determined at trial, including but not limited to, loss of income, loss of employment benefits, other financial losses, and loss of professional opportunities.

**COUNT VII**
**ILLINOIS' PERSONNEL RECORD REVIEW ACT**

101. Plaintiff incorporates by reference paragraphs 1-48 herein.

102. In early February 2026, Plaintiff requested from Defendant his personnel records under the IPPRA.

103. Defendant failed to disclose workplace complaints of harassment Plaintiff communicated to Defendant, documents related to his compensation, and investigation-related documentation concerning a prescription policy Defendant alleges Plaintiff to have violated.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a jury trial on all triable issues.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Anthony Rizzo prays that this Court:

1. Award damages to be determined at trial, including economic and non-economic damages, punitive damages, liquidated damages, attorney's fees, costs, and pre- and post-judgment interest.
2. Award all other such relief the Court deems just and proper.

Respectfully Submitted,

Anthony Rizzo

By his attorney,

*/s/ Bernard Schott*
Bernard (Ben) Schott
SCHOTT LLC
60 E. Monroe Street, Unit 4806
Chicago, IL 60603
(t) 773.350.6470
ben@bkschottlaw.com